[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION MOTION TO STRIKE [113]
This action involves a "trash-to-energy" plant located in Bristol, Connecticut. The plant has two furnaces for burning solid waste and one stack for releasing the furnace generated gases. Revised Complaint, ¶¶ 19-25. [109] [Paragraph references, e.g., ¶ 19, are to paragraphs of the Revised Complaint, dated March 16, 1993. 109}]
The plaintiff, Ogden Martin Systems of Bristol, Inc. [Ogden Martin], a Bristol taxpayer, owns and operates the plant. ¶¶ 2-3.
The idea for the plant was conceived in the early or mid-1980's. In 1985, eight municipalities agreed with Ogden Martin to have Ogden Martin build and operate a regional waste-to-energy resource recovery plant in Bristol, Connecticut. The plant would provide the municipalities with solid waste disposal services. Electric power would also be generated. ¶ 6-8.
The eight municipalities[1] created an operating committee to represent them in matters relating to the plant, etc. The project is called the "Bristol Resource Recovery Project." ¶ 7. Six more municipalities[2] have joined the project. There are now 14 municipalities participating. ¶ 1, 18. The plaintiff, Bristol Resource Recovery Facility Operating Committee [BRRFOC] is the operating committee created pursuant to the agreement of the participating municipalities. ¶¶ 1, 8. The agreement CT Page 6351 between and among the 14 municipalities authorizing the plaintiff, BRRFOC, is authorized by statute. See C.G.S. §§ 7-339a
and 22a-221. ¶ 1, 8.
In May 1988, the plant began commercial operation. ¶ 24.
In 1991, an expansion of the plant was contemplated. Proposals for the expansion were submitted to Stamford, Waterbury, and the Housatonic Resource Recovery Authority to induce them to participate in the construction and operation of the expanded plant. ¶ 26-27.
Plaintiffs claim that a plant expansion will be beneficial to all the participating municipalities. The solid waste disposal costs of the participating municipalities will be reduced. Bristol will benefit twofold. Its solid waste disposal costs will be reduced. Bristol will receive additional revenue because it is paid an amount based on the tonnage of solid waste accepted at the plant. Ogden Martin will benefit from the economies of scale and will receive more revenue due to increased tonnage accepted and electricity generated. ¶ 28-30.
Bristol has a Home Rule Charter. Section 50 of that Charter provides for an initiative procedure. ¶ 32. It provides:
"Sec. 50. Initiative and Removal
 "(a) Initiative. The electors of the Town and City of Bristol shall have the power to propose ordinances, resolutions and any other proper questions to the City Council. Special meetings of the electors for the purpose of voting on the aforesaid may be called at any time by the mayor or by the City Council, and shall be called whenever electors to the number of 15 percent of the electors who were entitled to vote at the last general city election shall petition that such meeting be called. The signatures to such a petition need not all be appended to one paper, but each signer shall add to his signature a statement of his place of residence, giving the street and number, if any. One of the signers of the petition shall make oath before an officer competent to administer oaths that each signature appended to such paper is the genuine signature CT Page 6352 of the person whose name it purports to be. Within five days from the filing of such petition with the town clerk, said town clerk shall ascertain if such petition is signed by the regular number of qualified electors, and he shall attach to such petition a certificate showing the result of such examination. if [If], by said clerk's certificate, the petition is found to be insufficient, it may be amended within ten days from the date of such certificate. The clerk shall make like examination of the amended petition, and, if his certificate shall show the same to be insufficient, it shall be returned to the person filing the same effect. If the petition shall be found to be sufficient, the clerk shall, without delay, submit the same to the City Council. The petition for each elector's meeting shall state specifically the ordinance, resolution and any other proper question it is desired to have submitted to vote at such meeting. Upon receipt of such petition, the City Council shall either (a) pass such matter without alteration, within 20 days after attachment of the clerk's certificate to the accompanying petition, in which case the petition shall become of no effect, or (b) if the petition shall not have been withdrawn in a written statement signed by a majority of the signers of the original petition, call a special meeting of the electors within 30 days unless a general municipal election is to be held within 90 days thereafter; and at such special or general meeting, the matter shall be submitted to a vote of the electors of said city. All votes at the meeting of the electors shall be taken by the check list at the polling places in the several voting districts. The registrars of voters shall have the power to appoint such election officers as are necessary. The question of the passage of any such matter shall be designated on the voting machine, or on the ballot, if required, in the following words `for the ordinance, resolution or question' as the case may be, (stating the nature of the proposed matter) and `against the ordinance, resolution or question' as the case may be. At the close of the election, the votes registered or ballots cast CT Page 6353 shall be counted immediately and the result in each voting district shall be declared by the moderator. The moderator for the first voting district shall declare the general result on this and all other elections and he shall certify the results to the town clerk forthwith. The registrars shall, if requested, appoint one challenger from each side of the matter to be voted upon. If a majority of the qualified electors voting upon any proposed matter shall vote in favor thereof, and their number is at least 20 per cent of the electors entitled to vote on the matter, such matter shall thereupon become a valid ordinance[,] resolution or action as the case may be, of the City and shall be binding thereon and any matter proposed by petition and which shall be adopted by the vote of the people as enumerated above, shall be repealed or amended except by vote of the people." Charter, § 50.
Anticipating a plant expansion, some Bristol electors petitioned to have the question stated below voted on at an election. ¶ 31. The petitions stated:
 "Whereas it is becoming increasingly important to the health and well-being of all people that the quality of life sustaining AIR, EARTH and WATER be carefully protected and preserved.
 "Therefore, we the undersigned electors of the City of Bristol, Connecticut hereby present this petition under the provisions of section 9-369
through 9-371 inclusive of the General Statutes of the State of Connecticut and pursuant to Section 50 of the Charter of the City of Bristol, demand the following question be placed on the ballot for binding resolution by Bristol electors at the November 5, 1991 Election as defined in section 9-1 of the Connecticut General Statutes:
 "Shall the City of Bristol permit a third burner and a second smoke stack to be installed at any trash to energy plant(s) within Bristol?" ¶ 31, Exhibit A to Revised Complaint. CT Page 6354
Sufficient petition signatures were obtained. The City Council ordered the question be placed on the ballot for the November 5, 1991 general election. ¶ 33-34.
At the November 5, 1991 election the following was presented to the electors:
 "Shall the City of Bristol permit a third burner and a second smoke stack to be installed at any trash to energy plant(s) within Bristol?" ¶ 35.
The final vote was 5,395 "yes" and 6,254 "no." ¶ 37.
The Revised Complaint has seven counts. The defendant, City of Bristol, has moved to strike each of the seven counts.
The Secretary of the State, the Connecticut Siting Council, and the Commissioner of Environmental Protection, have requested permission for amici curiae status to file a brief. The Secretary of the State, the Connecticut Siting Council, and the Commissioner of Environmental Protection, each claim a special interest or responsibility with respect to the subject matter of the First, Fourth and Fifth Counts, respectively. "The State Amici submit this brief in support of the defendant's motion with regard to these three issues touching upon the State Amici's duties and jurisdiction." Brief of Amicus Curiae Connecticut Siting Council, Commissioner of Environmental Protection, and Secretary of the State, May 17, 1993, p. 4.
Plaintiffs oppose the request. Bristol supports the motion. The court is not aware of any authority for such in the trial court. The motion has not been heard by the court. The court has not acted on the motion. The court has read the brief submitted by the Attorney General on behalf of the State Amici. The court has also read plaintiffs' brief in opposition to the request and brief filed by the Attorney General.
Each count of the Revised Complaint and the Motion to Strike as directed to each count is addressed below.
 I
The First Count is a request for a declaratory judgment. Plaintiffs seek a "judgment declaring the Initiative Proposal voted on by the electors of the City of Bristol on November 5, CT Page 6355 1991, to be null and void and of no force or effect. . . ." Revised Complaint, p. 25. [109]
Plaintiffs assert the vote on the initiative question is invalid and has not become effective because it is "contrary to Section 50 of the Bristol City Charter for the following reasons:
 "a. The language of the Initiative Proposal on the ballot did not conform to the requirements for initiative proposals contained in Section 50 of the Bristol City Charter because the question was not phrased as required by that section; and
 "b. Section 50 of the Bristol City Charter provides that an initiative may become effective only if a majority of qualified electors vote `in favor' of it and their number is at least 20 percent of the electors entitled to vote on the matter, and a majority of the qualified electors voting on the Initiative Proposal on November 5, 1991, did not vote `in favor' of the Initiative Proposal but, rather, a majority voted `No.' Revised Complaint, ¶ 38, pp. 10-11.
Bristol claims:
 "The first count fails to state a claim upon which relief can be granted in that the allegations do not state a good cause of action to show that the language of the initiative proposal was not in conformance with statutory requirements for election ballot questions under the election laws of the State of Connecticut and fail to show that the results of the ballot were not clear as a matter of law." Motion To Strike, ¶ 1. [113]
The essence of plaintiffs' claim is that the language of the initiative proposal and the vote thereon did not comply with the requirements of the Charter's section 50.
Plaintiffs seek a judgment declaring that the Initiative "to be null and void and of no force or effect." Revised Complaint, p. 25.
While not raised specifically, there is a question as to CT Page 6356 what was to be accomplished by the initiative vote. Was an ordinance to be enacted? Was a resolution intended?
Section 50 says:
 "The electors of the Town and City of Bristol shall have the power to propose ordinances, resolutions and any other proper questions to the City Council. . . The petition for each elector's meeting shall state specifically the ordinance, resolution and any other proper question it is desired to have submitted to vote at such meeting . . . The question of the passage of any such matter shall be designated on the voting machine, or on the ballot, if required, in the following words `for the ordinance, resolution or question' as the case may be, (stating the nature of the proposed matter) and `against the ordinance, resolution or question' as the case may be . . . If a majority of the qualified electors voting upon any proposed matter shall vote in favor thereof, and their number is at least 20 per cent of the electors entitled to vote on the matter, such matter shall thereupon become a valid ordinance[,] resolution or action as the case may be, of the City and shall be binding thereon and any matter proposed by petition and which shall be adopted by the vote of the people as enumerated above, shall be repealed or amended except by vote of the people." Charter, § 50.
There is a distinction between an ordinance and a resolution.
 "An ordinance is a municipal legislative enactment, Duplin v. Shiels, Inc., 165 Conn. 396, 398; Great Atlantic Pacific Tea Co. v. Scheuy, 148 Conn. 721, 723. It designates a local law of a municipal corporation, duly enacted by the proper authorities, prescribing general, uniform and permanent rules of conduct relating to the corporate affairs of the municipality. 5 McQuillin, Municipal Corporations (3rd Ed.) § 15.01. The passage of an ordinance must follow the formal procedural steps specified by statute or charter. CT Page 6357 First Church of Christ, Scientist v. Friendly Ice Cream, 161 Conn. 223, 227-28; Edward Balf Co. v. East Granby, 152 Conn. 319, 325-26; Jack v. Torrant, 136 Conn. 414, 419.
 "An ordinance prescribes some permanent rule of conduct or of government which is to continue in force until the ordinance is repealed. A resolution, generally speaking, is simply an expression of opinion or mind concerning some particular item of business coming within the legislative body's official cognizance, ordinarily ministerial in character and relating to the administrative business of the municipality. 5 McQuillin, Municipal Corporations (3d Ed.) § 15.02. Regulatory measures enacted by a city council pursuant to the police power must be in the form of an ordinance, while matters such as public works may originate with resolution. Hayes v. Hartford, 144 Conn. 74, 76." Morris v. Newington, 36 Conn. Sup. 74, 80 (1979), aff'd. 180 Conn. 89
(1980).
Did the vote on the initiative result in the enactment of an ordinance or the adoption of a resolution? The definitions given above are not particularly helpful.
The language of the petitions suggests the answer:
 "Therefore, we the undersigned electors of the City of Bristol, Connecticut hereby present this petition under the provisions of section 9-369 through 9-371 inclusive of the General Statutes of the State of Connecticut and pursuant to Section 50 of the Charter of the City of Bristol, demand the following question be placed on the ballot for binding resolution by Bristol electors
at the November 5, 1991 Election as defined in section 9-1 of the Connecticut General Statutes:
 "Shall the City of Bristol permit a third burner and a second smoke stack to be installed at any trash to energy plant(s) within Bristol?" [Italics added.] CT Page 6358
The words, "question" and "binding resolution" suggest a resolution, the electors' "expression of opinion or mind concerning some particular item of business [plant expansion] coming within the legislative body's official [City Council's] cognizance."
Of course the strongest point against the initiative's resulting in an ordinance is the question's language. If enactment of an ordinance were intended, the matter should not have been phrased as it was; the question on the ballot should have contained the exact language of the proposed ordinance. For example:
"Shall the following ordinance be enacted:
 "The City of Bristol shall not permit a third burner and a second smoke stack to be installed at any trash to energy plant(s) within Bristol."
The subject of the question being phrased as a question negates its being an ordinance. Laws usually are written as declaratory statements, not in the interrogative mode.
Since the number of signatures on the petitions were of sufficient number, the City Council had to order the petition proposal placed on the ballot for the coming general election. Section 50 does not permit the election officials to "fix up" the wording of the proposal. It had to be placed on the ballot just as it appeared on the petitions. The inclusion of the petition proposal on the ballot did not cure any defects vis-a-vis the Charter.
Plaintiffs' claim here is based on the language of section 50 of the Charter. The Motion To Strike itself does not mention' the Charter or its section 50. Bristol states:
 "The Plaintiffs claim that the results of the vote on the ballot question are not binding or valid because the language of the ballot question did not conform to Section 50 because the question was not phrased as required by Section 50. This claim has no basis in law." Memorandum of Law In Support of Motion To Strike, p. 6. [113.25]
Bristol then quotes the ballot question and concludes with CT Page 6359 the non sequitur: "This question was completely in compliance with Connecticut General Statutes, Section 9-369 and Section 9-369a, which govern the procedure for holding a referendum." Memorandum of Law In Support of Motion To Strike, p. 6. [113.25] Bristol sidesteps the Charter issue and thereafter ignores the existence of Section 50 and its requirements.
Bristol claims the present Charter's section 50 had antecedents "enacted through a series of Special Acts of the Legislature." Memorandum of Law In Support of Motion To Strike, p. 5. [113.25] How prior versions of section 50 bear on its construction here has not been stated by Bristol. It eludes the court.
Next, Bristol extols the clarity of the proposal and states that no one was mislead by the ballot language.[3] Even if the language were clear, that does not mean it complied with, or need not comply with, Section 50.
Plaintiffs' initial claim is that the ballot label designation of the initiative did not comply with section 50 of the Charter. Section 50 provides:
 "The question of the passage of any such matter shall be designated on the voting machine, or on the ballot, if required, in the following, words `for the ordinance, resolution or question' as the case may be, (stating the nature of the proposed matter) and `against the ordinance, resolution or question' as the case may be."
C.G.S. § 9-369 provides:
 "The vote on such amendment, question or proposal shall be taken by a `Yes' and `No' vote on the voting machine, and the designation of such amendment, question or proposal on the voting machine ballot label shall be `Shall (here insert the question or proposal, followed by a question mark).'"
It may be that section 50's "For — Against" ballot designation may have to bow to the "Yes — No" format required by C.G.S. § 9-369. That question need not be decided at this, the Motion to Strike stage. CT Page 6360
Plaintiffs' principal complaint is that the majority of "No" votes does not comply with section 50's requirement that approval comes about only "[[i]f a majority of qualified electors . . . shall vote in favor. . . ."
Plaintiffs claim the 6,254 "No" votes versus 5,395 "Yes" votes cannot be deemed a vote "in favor of" the proposal. Bristol disputes this claim. Bristol argues, perhaps rightly, that the intention of the electorate was clear. The vote shows that a majority of those voting on the matter wanted to prohibit any trash-to-energy plant in Bristol having a third burner and a second smoke stack.
While the intent of the voting majority is clear, that does not end the matter. The vote and the procedure authorizing the vote must comply with the Charter. The Charter says a proposal is enacted when a majority votes "in favor thereof."
The seminal and only source authority for the initiative procedure is the Charter's section 50. The general statutes provide no authority for the initiative.[4] Section 9-369a of the General Statutes by its terms recognizes the authority must come from another source.[5] It is clear that for any initiative to be effective, it must comply with section 50.
 "It is elementary that "[t]he charter is the fountainhead of municipal powers. It originates and defines the powers of government and the methods of governance. . . ." State ex rel. Raslavsky v. Bonvouloir, 167 Conn. 357, 362, 355 A.2d 275 (1974). In the construction of charters, ordinarily the rules of statutory construction are applied. 2 McQuillin, Municipal Corporations (3d Ed. Rev.) 9.22, p. 685. In arriving at the intention of the framers of the charter the whole and every part of the instrument or enactment must be taken and compared together. In other words, effect should be given, if possible, to every section, paragraph, sentence, clause and word in the instrument and related laws. `The real intention when once accurately and indubitably ascertained, will prevail over the literal sense of the terms. When the words used are explicit, they are to govern, of course. If not, then recourse is had to the context, the occasion and necessity of the CT Page 6361 provision, the mischief felt, and the remedy in view.' The language employed must be given its plain and obvious meaning, and, if the language is not ambiguous a court cannot arbitrarily add to or subtract from the words employed." 2 McQuillin, loc. cit.; see Sillman v. Sillman, 168 Conn. 144, 148-49, 358 A.2d 150 (1975); International Business Machines Corporation v. Brown, 167 Conn. 123, 133-34, 355 A.2d 236 (1974).
 "A charter of a city must be construed, if possible, so as reasonably to promote its ultimate purpose. Connelly v. Bridgeport, 104 Conn. 238, 256, 132 A. 690 (1926). A charter must receive a reasonable construction and must be examined in its entirety. Its parts must be reconciled and made operative so far as possible. Garbaty v. Norwalk Jewish Center, Inc., 148 Conn. 376, 382, 171 A.2d 197 (1961); Cislo v. Shelton, 35 Conn. Sup. 645, 656, 405 A.2d 84 (1978)." Arminio v. Butler, 183 Conn. 211, 217-8 (1981).
The question is whether the initiative proposal and the vote thereon were done in accordance with the Charter's section 50.
Applying the principles from the case just quoted, it is clear that the initiative proposal and the electors' action thereon did not comply with section 50. Section 50, the only source authority for the initiative procedure states that "[i]f a majority of qualified electors voting upon any proposed matter shall vote in favor thereof . . . such matter shall thereupon become a valid ordinance[,] resolution, or action as the case may be. . . ." It expressly requires a majority vote in favor of the matter.
"Furthermore, where the town charter prescribes a particular procedure by which a specific act is to be done or a power is to be performed, that procedure must be followed for the act to be lawful. [Citations omitted]" Miller v. Eighth Utilities District,179 Conn. 589, 594 (1980).
By no stretch can a majority of "No" votes be transformed into a "vote in favor thereof."
Another construction canon is applicable. CT Page 6362
 "In arriving at the intention of the framers of the charter the whole and every part of the instrument or enactment must be taken and compared together. In other words, effect should be given, if possible, to every section, paragraph, sentence, clause and word in the instrument and related laws. The real intention when once accurately and indubitably ascertained, will prevail over the literal sense of the terms. When the words used are explicit, they are to govern, of course. If not, then recourse is had to the context, the occasion and necessity of the provision, the mischief felt, and the remedy in view. The language employed must be given its plain and obvious meaning, and, if the language is not ambiguous a court cannot arbitrarily add to or subtract from the words employed." [Internal quotation marks omitted.] Arminio v. Butler, 183 Conn. 211, 217-8 (1981).
The court cannot subtract the words "[i]f a majority of qualified electors voting . . . shall vote in favor thereof . . . such matter shall thereupon become a valid ordinance[,], resolution or action" from section 50. But that is what would happen if the position Bristol espouses was accepted.
Bristol advocates adherence to § 9-369. It should be noted that C.G.S. § 9-369 states:
 "If, upon the official determination of the result of such vote, it appears that a majority of all the votes so cast are in approval of such amendment, question, or proposal, such amendment, question, or proposal shall, unless otherwise provided, take effect forthwith." [Italics added.] C.G.S. § 9-369.
 The vote on the initiative vote was not such that "it appear[ed] that a majority of all the votes so cast [were] in approval. . . ."
Section 9-369's "in approval" and the Charter's section 50's "vote in favor of" have the same meaning. Neither means that a majority of "No" votes is a vote in approval or in favor of any CT Page 6363 given proposal. A "No" vote is a vote against; it is not a vote in approval or a "vote in favor thereof" of any given proposal.
The Secretary of the State contends the initiative question was appropriately phrased. The Secretary maintains that the "Yes-No" designation is required by C.G.S. § 9-369 despite the "For-Against" required by section 50 of the Bristol Charter. The court, at least tentatively, agrees.
Significantly, the Secretary expresses no view on the real question, i.e. whether a majority of "No" votes can be deemed a "vote in favor thereof" of the initiative proposal and thus whether the initiative was adopted. The court interprets the Secretary's silence on this issue as an unwillingness to support Bristol on this issue.
The First Count states a viable cause of action.
 II
The Second Count of the Revised Complaint challenges the initiative as an illegal exercise of the zoning power. The Second Count alleges:
 "51. In Bristol, zoning is established under, and controlled by, the Bristol City Charter.
 "52. The Bristol City Charter dictates how the zoning power may be exercised and by whom.
 "53. Section 58 of the Bristol City Charter establishes a zoning commission of the City of Bristol and provides that `said zoning commission shall have all the powers and duties granted to zoning commissions under the general statutes.'
 "54. The Initiative proposal constitutes an exercise of zoning power.
 "55. The Initiative Proposal has not become binding on the City of Bristol or its City Council notwithstanding the vote on November 4, 1991, and is invalid and contrary to Section 58 of the Bristol City Charter because the Bristol City Charter expressly grants zoning powers to the zoning CT Page 6364 commission of the City of Bristol, and thereby precludes the exercise of zoning powers through the initiative procedure in Section 50 of the Bristol City Charter." Revised Complaint, ¶¶ 51-55, p. 16.
The Motion To Strike states:
 "2. The second count fails to state a claim upon which relief can be granted in that the adoption of the initiative proposal did not constitute an exercise of zoning power and is not in violation of established principles of zoning, nor is there any legally cognizable cause of action for improper exercise of zoning power." Motion To Strike, ¶ 2. [113]
In the Second Count plaintiffs have alleged: "The Initiative Proposal constitutes an exercise of zoning power." Revised Complaint. ¶ 54. [109] Bristol counters in part: "[T]he adoption of the initiative proposal did not constitute an exercise of the zoning power." Motion To Strike, ¶ 2. [103]
Plaintiffs contend that the initiative does implicate a zoning power since "it regulates property use generally, and specifically, in that it purports to regulate the `size of buildings and other structures.'" According to plaintiffs, C.G.S. § 8-2, the font of zoning regulation, authorizes the regulation of the "size of buildings and other structures." Memorandum In Opposition To Defendant's Motion To Strike, p. 18,
Among its many provisions, C.G.S. § 8-2 states that a "zoning commission . . . may regulate the erection, construction, reconstruction, alteration or use of buildings or structures and the use of land. C.G.S. § 8-2(a). "This statute provides that the authority to determine land use reposes solely in municipal zoning commissions. Shippee v. Zoning Board ofAppeals, 39 Conn. Sup. 436, 440 (App. Sess. Sup. Ct. 1983).
Bristol's bare assertion, "[T]he adoption of the initiative proposal did not constitute an exercise of the zoning power," has not been repeated or supported in its brief. Bristol makes no mention of or argument as to why the subject of the initiative is not within the parameters of zoning. Memorandum of Law In CT Page 6365 Support of Defendant's Motion To Strike, pp. 9-10. [113.25] Bristol has not suggested any power other than zoning given municipalities by the general statutes to regulate such as the initiative purports to do.
Bristol's main thrust is that the initiative is not an"improper" exercise of the zoning power. Bristol argues: "There simply is no basis in law for any claim that the initiative proposal is an "improper" exercise of zoning power." [Italics added.] Id, 10. The court interprets that sentence as meaning that although Bristol denies the initiative was an "improper"
exercise of zoning power' Bristol does not dispute the initiative was an exercise of zoning power.
The court concludes that the subject matter of the initiative comes within the purview of zoning.
O'Meara v. Norwich, 167 Conn. 579 (1975), has strong parallels to this case. Norwich has a charter pursuant to a special act. The Charter contained an overrule provision "which under certain circumstances requires reference of proposed ordinances to a special city election. The Charter conferred on the council the duties and functions relating to zoning which chapter 124 of the General Statutes vests in zoning commissions which have adopted chapter 124." The Charter "expressly grant[ed] the zoning powers to the council." O'Meara v. Norwich,167 Conn. 579, 582 (1975).
 "The plaintiff [O'Meara], an owner of land in Norwich, sought an amendment of the zoning map of the city of Norwich to change land . . . from a rural district to a residential district. After referral to the commission on the city plan, as required by the charter, and to the appropriate regional planning agency, as required by General Statutes 8-3b, and after proper notice and hearing, the city council adopted the amendatory ordinance. Within the time specified under the charter, a petition to overrule, purporting to be signed by not less than 5 percent of the electorate, was filed, requesting reference of the zoning ordinance to a special election in accordance with charter provisions. At a regular meeting of the council a date was set for the special city election. The special city election was held, and the ordinance CT Page 6366 amending the zoning regulations as adopted by the council was disapproved. The action of the council in referring the ordinance to special election was consistent with the overrule provision of the charter.
 "The plaintiff sought and was granted a judgment declaring that the reference to referendum in the case of a zoning ordinance was invalid." O'Meara v. Norwich, 167 Conn. 579, 580-581 (1975).
The Supreme Court stated that the Charter "expressly grants the zoning powers to the council. This by implication excludes the electorate from exercising these powers." Id @ 582. The Supreme Court held the overrule power given the electorate by the Charter did not to apply to zoning matters.
 "It is clear in examining chapter XV in its entirety that in enacting the charter of the city of Norwich by special act, the intent of the legislature was to vest the powers to enact and to change zoning regulations and zone boundaries exclusively in the council. There is a distinction, however, between the council acting in its general legislative capacity and promulgating independent police regulations, and acting in its capacity as a zoning authority. See State ex rel. Spiros v. Payne, 131 Conn. 647, 41 A.2d 908. When the council exercises its zoning powers, it acts, in effect if not in name, as a zoning commission. Sullivan v. Town Council, 143 Conn. 280, 288, 121 A.2d 630. In examining the charter as a whole, the legislative intent is apparent that the overrule provision in chapter V is to apply to ordinances of the council acting in its general legislative capacity and not to ordinances while it is sitting as a zoning commission.
 "To admit that a special city election could approve or disapprove an amendment to the zoning regulations would recognize a power in the city electorate directly at variance with the legislative intent expressed in the charter to vest that power exclusively in the zoning commission." O'Meara v. Norwich, 167 Conn. 579, 583 (1975). CT Page 6367
Bristol's Charter contains the following provision:
Sec. 58. Zoning Commission.
 (a) The zoning commission of the City of Bristol shall consist of five resident electors of the city . . .
 (b) Said zoning commission shall have all the powers and duties granted to zoning commissions under the general statutes.
(c) . . . .
 (d) All existing zoning ordinances of the city of Bristol shall, until change by the zoning commission, remain in full force and effect.
 (e) . . . ." Charter, City of Bristol, § 58.
The Norwich Charter "confer[red] on the council the duties and functions relating to zoning which chapter 124 of the General Statutes vests in zoning commissions which have adopted chapter 124." O'Meara v. Norwich, @ 582. Similarly, the Bristol Charter says the "zoning commission shall have all the powers and duties granted to zoning commissions under the general statutes." Charter, § 58(b). The zoning powers granted the Norwich council and the Bristol zoning commission by the respective Charters are the same.
O'Meara v. Norwich held the overrule authority given the Norwich electorate by the Norwich Charter did not apply to the council "while it [was] sitting as a zoning commission." O'Mearav. Norwich, @ 583.
The initiative authority given the Bristol electorate by charter and the overrule authority of the Norwich electorate are equal in scope and limitation vis-a-vis zoning.
The court believes the sole authority within the City of Bristol to regulate as the initiative purports to do is the zoning commission. The court concludes the initiative is invalid since it purports to regulate a zoning matter. CT Page 6368
The Second Count states a viable cause of action.
 III
The Third Count mounts "due process" and "equal protection" challenges to the initiative action. That count alleges:
 "56. The Facility is the only `trash to energy plants(s)' which now exists, or ever has existed, in the City of Bristol.
 "57. The construction and operation of `trash to energy plant(s)' is a legitimate and legal business which provides solid waste disposal and electric power generation.
 "58. There is no direct relationship between the number of `burner[s]' or the number of `smoke stack[s]' at `trash to energy plant(s)' and the effect of such plant on public health, safety, general welfare or any other proper legislative purpose of the City of Bristol.
 "59. The enactment of the Initiative Proposal, which prohibits a third burner' and a `second smoke stack' without regard to size, emissions, or any other criterion is clearly arbitrary, unreasonable, and has no substantial relation to the regulation of public health, safety, general welfare, or any other proper legislative purpose of the City of Bristol.
 "60. There are, or could be, facilities in Bristol, which are not `trash to energy plant(s)' and which have, or could be expected to have, similar or worse emissions or a similar or worse environmental impact or which have, or could be expected to have, a similar or worse effect on public health, safety or general welfare of the City of Bristol.
 "61. Because there is no fair and substantial difference germane to the subject and purpose of the Initial Proposal between `trash to energy CT Page 6369 plant(s)' and other similarly situated facilities in Bristol, the Initiative Proposal unfairly discriminates against the Bristol Resource Recovery Project by prohibiting a `third burner and a second smoke stack to be installed at any trash to energy plant(s) within Bristol.'"
Revised Complaint, ¶¶ 56-61, pp. 16-18. [109]
Plaintiffs conclude by claiming the initiative proposal "violates the due process and equal protection clauses" of the federal and state constitutions. Id, ¶ 62.
Bristol challenges this contention.
 "3. The third count fails to state a claim upon which relief can be granted in that the adoption of the initiative proposal by the electors of the City of Bristol does not violate the equal protection and due process provisions of the Constitution of the United States and the Constitution of the State of Connecticut in that the initiative proposal does not discriminate between any trash to energy plant and is a proper exercise of the initiative provisions of the Charter of the City of Bristol. Motion To Strike, ¶ 3.
Neither party has made any distinction between "due process"[6]
and "equal protection" or proffered a separate argument or analysis for each. The court assumes that both concepts merge and/or coalesce under the circumstances of this case.
Bristol relies on Zapata v. Burns, 207 Conn. 496 (1988), to refute plaintiffs' equal protection claims. As that case recognizes, "equal protection" under the federal and Connecticut Constitutions have the same meaning and limitations. Id., 504, 505. Both parties apparently agree on that proposition. Memorandum In Support of Defendant's Motion To Strike, p. 11. [113.25]; Memorandum In Opposition To Defendant's Motion To Strike, p. 21.
When considering equal protection claims, the court must first determine the standard to be used in evaluating the validity of the statute. CT Page 6370
 "When a statute is challenged on equal protection grounds . . . the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. Ryszkiewicz v. New Britain, 193 Conn. 589, 596, 479 A.2d 793 (1984). When a statutory classification impinges upon an inherently suspect class or affects a fundamental personal right, the statute is subject to strict scrutiny and is justified only by a compelling state interest. State Management Assn. of Connecticut, Inc. v. O'Neill, 204 Conn. 746, 750, 520 A.2d 1276 (1987); Keogh v. Bridgeport, supra,
66; Frazier v. Manson, 176 Conn. 638, 645, 410 A.2d 475 (1979); see Dunn v. Blumstein, 405 U.S. 330, 335-42, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Otherwise, a statute will stand if the classification bears a reasonable relation to a legitimate state interest. State Management Assn. of Connecticut, Inc. v. O'Neill, supra; Ryszkiewicz v. New Britain, supra,
597; Keogh v. Bridgeport, supra. Ecker v. West Hartford, supra, 237-38.
 ". . . A right is fundamental for purposes of equal protection analysis if it is explicitly or implicitly guaranteed by the constitution. [Citations omitted]. . . ." [Internal quotation marks omitted.] Zapata v. Burns, 207 Conn. 496, 505 (1988).
It cannot be seriously contended that operation of a trash-to-energy plant, free of restriction on the number of its burners or smokestacks, is a fundamental personal right. Thus, strict scrutiny is not necessary on that score. But, plaintiffs' plant is the only trash-to-energy in Bristol. And, it is not clear that this trash-to-energy plant or trash-to-energy plants in general should be in a separate class. Perhaps they should be. It is not self evident that trash-to-energy plants should be classified differently than other plants having burners and smokestacks. It appears to the court that the initiative proposal's classification is "inherently suspect." That means the initiative proposal "is subject to strict scrutiny and is justified only by a compelling state interest." [Citations omitted.]Zapata v. Burns, 207 Conn. 496, 505 (1988). While plaintiffs have not alleged specifically that the classification is "inherently suspect" and therefore a "compelling state interest" must CT Page 6371 be shown to justify the initiative, under our liberal pleading rules, evidence of same would be admissible under the Revised Complaint.
Even if the classification made by the initiative proposal is not inherently suspect, and strict scrutiny is not the standard, the initiative proposal will only withstand an "equal protection" challenge, if it "bears a rational relation to a legitimate state interest." [Citations omitted.] Zapata v.Burns, 207 Conn. 496, 505 (1988). Under this so-called "rational relation test,"
 "[t]he court's function . . . is to decide whether the classification and disparate treatment inherent in a statute bear a rational relationship to a legitimate state end and are based on reasons related to the accomplishment of that goal. Daily v. New Britain Machine Co., supra, 577. `"A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relationship to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."' Id., 578, quoting Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).'" Zapata v. Burns, 207 Conn. 496, 507 (1988).
 "The equal protection clause mandates like treatment for all those similarly situated. [Citations omitted.] In determining the validity of disparities in personal treatment, courts ordinarily invoke the rational basis test, which is especially applicable to the review of economic and social legislation. [Citations omitted.]" Motor Vehicles Manufacturers Association v. O'Neil, 212 Conn. 83, 99 (1989).
 "In the case of economic regulation, the test to determine constitutionality is well established in our cases. The equal protection and the due process provisions of both constitutions have the same meaning and the same limitations. Miller v. Heffernan, [173 Conn. 506, 516-17, 378 A.2d 572
(1977)]; Horton v. Meskill, 172 Conn. 615, 639, 376 A.2d 359 (1977); Kellems v. Brown, 163 Conn. 478, CT Page 6372 485, 313 A.2d 53, appeal dismissed, 409 U.S. 1099, 93 S.Ct. 911, 34 L.Ed.2d 678 (1972); Katz v. Brandon, 156 Conn. 521, 537, 245 A.2d 579 (1968); People v. Santiago, 51 App.Div.2d 1, 10, 379 N.Y.S.2d 843
(1975)." Caldor's, Inc. v. Bedding Barn, Inc., supra, 314; see also 2 R. Rotunda, J. Nowak J. Young, Constitutional Law: Substance and Procedure 15.4, pp. 51-52. "Under any and all of these provisions, an act regulating economic activity must bear a reasonable relationship to a proper legislative purpose in a manner that is neither arbitrary nor discriminatory. Carroll v. Schwartz, 127 Conn. 126, 130, 14 A.2d 754 (1940). `The court's function . . . is to decide whether the purpose of the legislation is a legitimate one and whether the particular enactment is designed to accomplish that purpose in a fair and reasonable way. If an enactment meets this test, it satisfies the constitutional requirements of due process and equal protection.' Pierce v. Albanese, 144 Conn. 241, 249, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S.Ct. 36, 2 L.Ed.2d 21 (1957). The constitutional issue is whether legislative classifications or discriminations bear `a rational relationship to a legitimate state end and [are] based on reasons related to the pursuit of that goal.' Gentile v. Altermatt, 169 Conn. 267, 295, 363 A.2d 1, appeal dismissed, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 631 (1976)." Caldor's, Inc. v. Bedding Barn, Inc., supra, 314-15. "[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . . in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." New Orleans v. Dukes, supra, 303-304." Blue Sky Bar, Inc. v. Stratford, 203 Conn. 14, 26-27 (1987).
Plaintiffs allege there is no legitimate relation between the limitations imposed by the initiative and any legitimate governmental end. The supposed reason for the initiative must be considered. The preamble on the petitions which started the initiative procedure states: CT Page 6373
 "Whereas it is becoming increasingly important to the health and well-being of all people that the quality of life sustaining AIR, EARTH, and WATER be carefully protected and preserved. . . ." Exhibit A to Revised Complaint. [109]
The court is well aware that legislative enactments are to be given great deference by courts particularly when equal protection challenges are made. The court is not to sit as a superlegislature when such challenges are made. But the deference due an enactment of Congress, a state legislature, or even a municipal legislative body, need not be given this initiative. This is due in part to the fact that legislative bodies act with many safeguards, including extensive research, hearings, debate, etc. And, at least on the federal and state levels, their enactments only become law after executive approval or veto-override procedure. Since the Bristol initiative procedure does not have these or like safeguards, less deference need be shown it.
The Revised Complaint alleges as fact that the classification is improper and that there is no relationship between the 1, number of a plant's burners and smokestacks and the effect on air, water and earth, namely, the effect on the environment. It is not immediately self-evident that the constraints imposed by the initiative would lead to a cleaner environment. For example, plaintiffs' plant currently has two furnaces each with a design capacity to process and burn 325 tons of solid waste per day. ¶ 20. The plant can process and burn in the order of 650 tons of solid waste daily. If plaintiffs developed and/or employed technology which would process and burn 650 tons of solid waste per day "cleaner" than at present, but which would necessitate more than two furnaces or more than one smokestack, the initiative would prohibit this environmental improvement.[7]
This case is at the Motion To Strike stage. Bristol has neither admitted nor denied plaintiffs' allegations. Whether the plaintiffs can prove their allegations must await a later stage of the case. Equal protection claims such as those here are inherently fact bound. At this stage, the court must accept those allegations as true. They clearly state a viable equal protection cause of action.
The Third Count states a viable cause of action. CT Page 6374
 IV
In the Fourth Count, plaintiffs claim the subject matter of the initiative is preempted by the Public Utilities Environmental Standards Act. Plaintiffs allege:
 "64. The Bristol Resource Recovery Project is an electric power generating facility that is subject to state regulation under the Public Utility Environmental Standards Act, Conn. Gen. Stat. § 16-50h, et seq.
 "65. Pursuant to Conn. Gen. Stat. § 16-50x, the Connecticut Siting Council has exclusive jurisdiction over the location and type of electric generating facilities, such as the Bristol Resource Recovery Project, and the location and type of modifications that can be made to such facilities.
 "66. Ogden Martin received a Certificate of Environmental Compatibility and Public Need for the Facility from the Connecticut Siting Council on or about August 29, 1985.
 "67. The legislature has demonstrated its intent to occupy the entire field of regulation of the location and type of modifications that can be made to an electric generating facility such as the Bristol Resource Recovery Project, with the limited exception of municipal authority which may be exercised as provided for in the statute.
 "68. Conn. Gen. Stat. § 16-50x(d) permits a municipality to regulate and restrict the location of an electric generating facility, such as the Bristol Resource Recovery Project, subject to the Public Utility Environmental Standards Act, through a town, city, or borough zoning commission or inland wetlands agency, provided, however, that any orders of such local bodies are to be made only within 30 days of an application pursuant to the Act and shall be appealable to the Connecticut Siting Council.
"69. The Initiative Proposal violates Conn. Gen. CT Page 6375 Stat. § 16-50x(d) and is inconsistent with the state regulatory scheme for electric generating facilities, in that
 a. it is not the action or order of a town, city or borough zoning or inland wetland agency;
 b. it is not an action or order taken within 30 days of an application, but rather it prevents and precludes the making of such an application; and precludes the making of such an application; and
 c. it does not permit or provide for an appeal to the Connecticut Siting Council."
Revised Complaint, ¶¶ 64-69, pp. 18-20. [109]
In short, plaintiffs claim that the initiative was preempted by Public Utility Environmental Standards Act, C.G.S. §§ 16-50h, et seq.
Bristol disputes that claim.
 "4. The fourth count does not state a claim upon which relief can be granted in that the doctrine of preemption based on the Public Utility Environmental Standards Act is inapplicable to this action. Motion To Strike, ¶ 4. [113]
Although neither party has suggested it, the court believes that the point of departure on this issue should be the Public Utility Environmental Standards Act itself.
Right up front, the General Assembly stated the Act's reasond'etre.
 "Sec. 16-50g. Legislative finding and purpose.
The legislature finds that power generating plants and transmission lines for electricity and fuels, community antenna television towers and telecommunication towers have had a significant impact on the environment and ecology of the state of Connecticut; and that continued operation and development of such power plants, lines and towers, if not properly planned and controlled, could CT Page 6376 adversely affect the quality of the environment, the ecological, scenic, historic and recreational values of the state. The purposes of this chapter are: To provide for the balancing of the need for adequate and reliable public utility services at the lowest reasonable cost to consumers with the need to protect the environment and ecology of the state and to minimize damage to scenic, historic, and recreational values; to provide environmental quality standards and criteria for the location, design, construction and operation of facilities for the furnishing of public utility services at least as stringent as the federal environmental quality standards and criteria, and technically sufficient to assure the welfare and protection of the people of the state; to encourage research to develop new and improved methods of generating, storing and transmitting electricity and fuel and of transmitting and receiving television and telecommunications with minimal damage to the environment and other values described above; to promote the sharing of towers for fair consideration wherever technically, legally, environmentally and economically feasible to avoid the unnecessary proliferation of towers in the state particularly where installation of such towers would adversely impact class I and II watershed lands, and aquifers; to require annual forecasts of the demand for electric power, together with identification and advance planning of the facilities needed to supply that demand and to facilitate local, regional, state-wide and interstate planning to implement the foregoing purposes." C.G.S. § 16-50g.
This section does not state explicitly where the power to regulate to accomplish the legislature's goals is to reside. However, the statement of finding and purpose is a powerful prologue suggesting that piecemeal, "not in my backyard," municipal, local regulatory approach will not suffice. An overall statewide, or perhaps regional, scheme and authority is necessary.
The Public Utility Environmental Standards Act "by its terms, is intended to `provide for the balancing of the need for adequate and reliable public utility services . . . with the need to protect the environment and ecology of the state and to CT Page 6377 minimize damage to scenic, historic, and recreational values.' § 15-50g." Haynes v. Power Facility Evaluation Council,177 Conn. 623, 624 (1979).
The Act establishes a "Connecticut Siting Council," thereafter referred to in the Act as the "council." C.G.S. § 16-50j.
The "council's" authority is defined in such a way as to leave no doubt as to its breadth or scope.
 Sec. 16-50x Exclusive jurisdiction of council; exception. Eminent domain after certification. Municipal regulation of proposed location. (a) Notwithstanding any other provision of the general statutes to the contrary, except as provided in section 16-243,[8] the council shall have exclusive jurisdiction over the location and type of facilities and over the location and type of modifications of facilities subject to the provisions of subsection (d) of this section. In ruling on applications for certificates for facilities, the council shall give such consideration to other state laws and municipal regulations as it shall deem appropriate. Whenever the council certifies a facility pursuant to this chapter, such certification shall satisfy and be in lieu of all certifications, approvals and other requirements of state and municipal agencies in regard to any questions of public need, convenience and necessity for such facility. [Italics added for emphasis.]'
"(b) . . .
"(c) . . .
 "(d) Any town, city or borough zoning commission and inland wetland agency may regulate and restrict the proposed location of a facility as defined in subdivisions (3) and (4) of subsection (a) of section 16-50i. Such local bodies may make all orders necessary to the exercise of such power to regulate and restrict, which orders shall be made within thirty days of any application and shall be in writing and recorded in the records of their respective communities, and written notice of any order shall be given to each party affected thereby. Each such order shall be subject to the CT Page 6378 right of appeal within thirty days after the giving of such notice by any party aggrieved to the council, which shall have jurisdiction, in the course of any proceeding on an application for a certificate or otherwise, to affirm, modify or revoke such order or make any order in substitution thereof by a vote of six members of the council." C.G.S. § 16-50x.
"The council is a state agency that has exclusive jurisdiction over the location, or `siting,' and type of certain statutorily defined utility and communication facilities, with a mandate to balance the public need for utility services with the adverse environmental effects of the proposed facility. See General Statutes §§ 16-50x and 16-50i(a)." Preston v. Connecticut SitingCouncil, 20 Conn. App. 474, 476, fn. 2 (1990).
 "It is clear that, under PUESA framework, the role of the council in its review of local zoning decisions was meant to be comprehensive and plenary. Pursuant to General Statutes 16-50x(a), the council has, with one exception inapplicable here, "exclusive jurisdiction over the location and type of facilities. . . ." General Statutes 16-50g mandates that the council, in performing its statutory functions, do so in a manner consistent with its purposes, namely, to balance the need for public utility services at a reasonable cost with environmental, ecological, scenic, historic and recreational values; to ensure that the environmental quality standards of utility service facilities are at least equal to analogous federal standards, and are technically sufficient; to encourage research for the development of new methods of providing such services with minimal damage to such values; to require forecasting of the demand for electricity; and to facilitate local, regional and interstate planning in order to implement the purposes of the council. These purposes go far beyond local zoning concerns. Preston v. Connecticut Siting Council, 20 Conn. App. 474, 485
(1990).
The plaintiffs allege their plant is an "electric power generating facility." ¶ 64. As such it is a "facility" as defined by the Act. C.G.S. § 16-50i. The language of the Act is clear and unambivalent. The council has exclusive jurisdiction over plaintiffs' trash-to-energy facility. CT Page 6379
Bristol acknowledges that subsection (d) of C.G.S. § 16-50x, relating to the limited role to be played by municipal zoning commissions and inland wetlands agencies in the siting process "is inapposite to this case." Memorandum of Law In Support of Motion To Strike, p. 14. [113.25] But the very existence of that subsection only fortifies the conclusion that the council has exclusive jurisdiction. The council has appellate jurisdiction of any order made by a municipal zoning commission or inland wetland agency; the council has the power "to affirm, modify or revoke such order or make any other order in substitution thereof . . . ." C.G.S. § 16-50x(d). Furthermore, "the council shall give such consideration to . . . municipal regulations as it shall deem appropriate." C.G.S. § 16-50x(a). These two provisions make it clear the council was to be free of any restraints arising from any attempted or purported exercise of municipal authority.
Similarly, section 16-50x provides that "the council shall have exclusive jurisdiction . . . over the location and type of modifications of facilities subject to the provisions of subsection (d) of this section. "`Modification' means a significant change of alteration in the general physical characteristics of a facility." C.G.S. § 16-50i(d). Certainly, the installation of a third burner and/or a second smokestack would be a "modification." The council alone has the power to permit or prohibit the installation of a third burner and/or second smokestack at plaintiffs' trash-to-energy plant. The Bristol electorate is preempted by the express provisions of the Public Utility Environmental Standards Act.
Another section of the Public Utilities Environmental Standards Act provides:
 "16-50w. Conflicting provisions. In the event of any conflict between the provisions of this chapter and any provisions of the general statutes, as amended, or any special act, this chapter shall take precedence." C.G.S. § 16-50w.
While section 16-50w does not have direct effect on the question raised here, it is not without significance. It states that other general statutes or special acts, i.e., all other acts' of the General Assembly, shall bow to the Public Utility Environmental Standards Act. Any municipal ordinance which conflicts CT Page 6380 with a state statute is superseded by the state statute. Sheltonv. Commissioner, 193 Conn. 506, 517 (1984). Surely, the General Assembly intended, and made that intent clear, that the Public Utility Environmental Standards Act was to subsume the entire regulatory field relating to facilities such as the plaintiffs' trash-to-energy plant.
The court admits it has not understood Bristol's argument(s) regarding the Fourth Count. For example, Bristol says: "There is nothing in Chapter 277a [Public Utility Environmental Standards Act] which precludes or preempts the initiative proposal as voted upon by the electors of Bristol." Memorandum of Law In Support of Defendant's Motion To Strike, p. 14. [113.25] That proposition is immediately followed by the contradictory statement — "Connecticut General Statutes, Section 16-50x(a) provides for the exclusive jurisdiction of the Connecticut Siting Council over the location and type of facilities and over the location and type of modifications of facilities subject to the provisions of Subsection (d). . . . [Subsection] (d) is inapposite to this case, as the initiative proposal does not purport to be an action of the zoning commission or inland wetland agency, nor does the initiative proposal make any reference to the Connecticut Siting Council or any permit applications filed or to be filed thereto." Id.
With the respect to the Fourth Count, the Connecticut Siting Council, declares that "[t]o the extent that the Initiative Proposal purports to be an exercise of Bristol's Host Community Veto granted under the Inter-Community Agreement, the Initiative Proposal is not preempted." Brief of Amici Curiae Connecticut Siting Council, Commissioner of Environmental Protection, And Secretary of The State, p. 5. That is not a claim made by the plaintiffs in this action. No one disputes Bristol's right to exercise its Home Rule Veto in the manner prescribed by the Inter-Community Agreement.[9] The Siting Council's other assertions clearly are to the effect that it (the Siting Council) has exclusive and final say on plaintiff's plant. The Siting Council correctly states it "has exclusive regulatory jurisdiction over the location and type of such facilities, including the location and type of any modifications such as the proposed expansion of [plaintiffs'] Facility." Id, p. 6. The court concludes that the Siting Council weighs in on the plaintiffs' side of the real issue presented in the Fourth Count.
Despite Bristol's contentions, the court concludes that the CT Page 6381 initiative proposal purports to regulate a matter within the ambit of the Public Utility Environmental Standards Act. As such, the initiative proposal is preempted by that Act.
Bristol's claim that the Fourth Count fails to state a cause of action must fail.
The Fourth Count states a viable cause of action.
 V.
In the Fifth Count of the Revised Complaint, plaintiffs claim the subject matter of the initiative proposal is preempted because authority to regulate plaintiffs' plant has been ceded to the Department of Environmental Protection (DEP). According to the plaintiffs, this exclusive jurisdiction resides in the DEP by virtue of the Air Pollution Control Act,[10] the Solid Waste Management Act,[11] and the Solid Waste Management Services Act.[12]
Plaintiffs claim the legislative plan shows an implied preemption, i.e. the legislature intended that the DEP's authority preempts any municipal regulation such as that in the initiative proposal.
The Fifth Count contains the following allegations:
 "71. The construction, operation and modification of the resource recovery facility owned by Ogden Martin as part of the Bristol Resource Recovery Project was and is regulated by the Connecticut Department of Environmental Protection (the "DEP") pursuant to its authority under Title 22a of the Connecticut General Statutes, including the issuance by the DEP of permits pursuant to Connecticut Solid Waste Management Act and the Air Pollution Control Act, Chapters 446d and 446c of the Connecticut General Statutes.
 "72. Among the permits issued to Ogden Martin for the Bristol Resource Recovery Project by the DEP pursuant to Title 22a of the Connecticut General Statutes are the following: air quality permits to construct and to operate; solid waste permits to construct and to operate; and a Connecticut State discharge permit.
 "73. The legislature had demonstrated its intent to occupy the entire field of environmental regulation CT Page 6382 of facilities such as the Bristol Resource Recovery Project, with the limited exception of municipal authority which may be exercised only in the manner, and to extent, it is not inconsistent with the statutory and regulatory scheme administered by the DEP and permits issued by the DEP thereunder.
 "74. The Initiative Proposal violates, inter alia, the Air Pollution Control Act, Chapter 446c; the Solid Waste Management Act, Chapter 446d; the Solid Waste Management Services Act, Chapter 446e; and more specifically including but not limited to §§ 22a-258, 22a-259, 22a-208a, 22a-208(d) and 22a-228 of the Connecticut General Statutes in that it is inconsistent with this pervasive state statutory scheme, and the regulations promulgated thereunder, and is not a proper exercise of zoning and/or environmental regulation by the City of Bristol."
Revised Complaint, ¶¶ 71-74, p. 21-22. [109]
Plaintiffs' have dubbed the Fifth Count "DEP Preemption" and say it alleges "implied preemption." Revised Complaint, p. 21; Memorandum In Opposition To Defendant's Motion To Strike, pp. 27-29.
Bristol claims:
 "5. The fifth count fails to state a claim upon which relief can be granted in that the doctrine of preemption based on the statutory provisions pertaining to the Department of Environmental Protection of the State of Connecticut is inapplicable to this action." Motion To Strike, ¶ 5. [113]
Bristol's elaboration of its position again fails to appreciate the preemption doctrine. Memorandum of Law In Support of Defendant's Motion To Strike, pp. 15-16. [113.25] Bristol states:
 "The initiative proposal does not make any reference to the Commissioner or Department of Environmental Protection or any permit applications filed or to be filed thereto. The initiative proposal does not purport to bind or restrict any exercise of power by the Commissioner or Department of Environmental Protection. The CT Page 6383 Plaintiffs' claims of preemption are inapplicable to this action." Memorandum of Law In Support of Defendant's Motion To Strike, p. 16. [113.25]
Neither party has furnished any authority regarding "implied preemption."
 "[T]he law of preemption is clearly set forth in Shelton v. Commissioner, 193 Conn. 506, 479 A.2d 208
(1984). In that case, we stated that [a] local ordinance is preempted by a state statute whenever the legislature has demonstrated an intent to occupy the entire field of regulation on the matter . . . or . . . whenever the local ordinance irreconcilably conflicts with the statute. . . . Whether an ordinance conflicts with a statute or statutes can only be determined by reviewing the policy and purposes behind the statute and measuring the degree to which the ordinance frustrates the achievement of the state's objectives. . . . (Citations omitted.) Id., 517, quoting Dwyer v. Farrel, 193 Conn. 7, 12-14, 475 A.2d 257 (1984)." Helicopter Associates, Inc. v. Stamford, 201 Conn. 700, 705 (198-6).
With that brief view of "preemption," the court must look at the statutes involved to determine the scope and breadth of what the legislature has done in these areas.
The Air Pollution Control Act, C.G.S. §§ 22a-170 to 22a-194g, gives the Commissioner of Environmental Protection the "power to formulate, adopt, amend and repeal regulations to control and prohibit air pollution throughout the state. . . ." C.G.S. § 22a-174(a). The statute then elaborates thereon:
 "(c) The commissioner shall have the power, in accordance with regulations adopted by him, (1) to require that a person, before undertaking the construction, installation, enlargement or establishment of a new air contaminant source specified in the regulations adopted under subsection (a), submit to him plans, specifications and such information as he deems reasonably necessary relating to the construction, installation, enlargement, or establishment of such new air contaminant source; (2) to issue a permit approving such plans and specifications and permitting the construction, installation, enlargement or establishment CT Page 6384 of the new air contaminant source in accordance with such plans, or to issue an order requiring that such plans and specifications be modified as a condition to his approving them and issuing a permit allowing such construction, installation, enlargement or establishment in accordance therewith, or to issue an order rejecting such plans and specifications and prohibiting construction, installation, enlargement or establishment of a new air contaminant source in accordance with the plans and specifications submitted; (3) to require periodic inspection and maintenance of combustion equipment and other sources of air pollution; (4) to require any person to maintain such records relating to air pollution or to the operation of facilities designed to abate air pollution as he deems necessary to carry out the provisions of this chapter and section 14-164c; (5) to require that a person in control of an air contaminant source specified in the regulations adopted under subsection (a), obtain a permit to operate such source if the source (A) is subject to any regulations adopted by the commissioner concerning high risk hazardous air pollutants, (B) burns waste oil, (C) is allowed by the commissioner, pursuant to regulations adopted under subsection (a), to exceed emission limits for sulfur compounds, (D) is issued an order pursuant to section 22a-178 or (E) violates any provision of this chapter, or any regulation, order or permit adopted or issued thereunder; (6) to require that a person in control of an air contaminant source who is not required to obtain a permit pursuant to this subsection register with him and provide such information as he deems necessary to maintain his inventory of air pollution sources; (7) to require a permit for any source regulated under the federal Clean Air Act Amendments of 1990, P.L. 101-549; and (8) to refuse to issue a permit if the Environmental Protection Agency objects to its issuance in a timely manner under Title V of the federal Clean Air Act Amendments of 1990. The commissioner may require renewal of such registration at intervals he deems necessary to maintain such inventory.
 "(d) The commissioner shall have all incidental powers necessary to carry out the purposes of this chapter and section 14-164c." C.G.S. § 22a-174. CT Page 6385
The authority granted the Commissioner of Environmental Protection by § 22a-174 is comprehensive and pervasive. The great breadth and depth of that authority becomes evident as the remaining sections of the Air Pollution Control Act are considered. And, the Commissioner has the authority to promulgate regulations regarding air quality control. Those regulations are thorough and encompassing.
Nothing in the Air Pollution Control Act, or the regulations published pursuant to the Act, even suggests that a facility like plaintiffs can be regulated by a municipality as the initiative vote purports to do.
The court has examined the Air Pollution Control Act and the regulations thereunder. The statutes and regulations show a comprehensive scheme for statewide control integrated with the similar national legislation. The very nature of the problem, air pollution, requires at the least statewide regulation. Local regulation would be largely ineffective. The atmosphere, air currents and wind, are oblivious to municipal boundaries. The legislature has given the commissioner of environmental protection the broadest geographical authority it could, i.e. statewide authority. The legislature has given little but illusory authority to municipalities in this regard. In fact, where the legislature has ceded any power to the municipalities in the domain of air pollution control, it has qualified the same by making it subject to the approval of or aegis of the commissioner.
Two or more municipalities may join "in the formation of a district for the control of air pollution" but only "[u]pon approval of the commissioner." C.G.S. § 22a-185. The statute provides:
 "Municipal districts for control of air pollution. Upon approval of the commissioner, any municipality, pursuant to ordinance, may join with any other municipality or combination thereof, in the formation of a district for the control of air pollution. Any municipality or such district may adopt ordinances or regulations for the control of air pollution within its territorial limits. Such ordinances or regulations may embody the regulations promulgated hereunder, in whole or in part, or may consist of other ordinances or regulations in conformity with the regulations promulgated hereunder. No such ordinance or regulation shall be effective CT Page 6386 until fifteen days after approval by the commissioner. If the commissioner fails to act upon such ordinances or regulations within sixty days after submission to him, such ordinances or regulations shall be deemed to be approved. In acting upon such ordinances or regulations the commissioner shall give due consideration to the standards set forth in section 22a-176. Nothing contained in this section shall be construed to prevent the enforcement of any municipal ordinance or regulation for the control of air pollution not in conflict with this chapter or any regulations promulgated hereunder, which ordinance or regulation was adopted by the legislative body of any municipality prior to July 6, 1967. Subject to the approval of the commissioner, nothing contained in this section shall prohibit a municipal ordinance or regulation from imposing stricter controls than the regulations promulgated hereunder." C.G.S. § 22a-185.
Similarly, C.G.S. § 22a-174(f) provides for the burning of brush in a municipality but only when the Commissioner has issued a permit. However, the commissioner cannot issue a permit to burn brush if the municipality has an ordinance prohibiting brush burning. C.G.S. § 22a-174(f).
These two statutory provisions make it evident the commissioner's authority is controlling except where the legislature expressly granted some power to the municipalities to contribute to the regulation of air pollution. Nothing in the Air Pollution Control Act suggests the legislature intended that the Commissioner could be undermined by municipal action.
The Solid Waste Management Act, C.G.S. §§ 22a-207 to 22a-256ee, delegates considerable authority to the Commissioner of Environmental Protection.
 "Powers and duties of commissioner re solid waste management. (a) The commissioner shall administer and enforce the planning and implementation requirements of this chapter. He shall examine all existing or proposed solid waste facilities and provide for their proper planning, design, construction, operation, monitoring, closure and postclosure maintenance in a manner which ensures against pollution of the waters of the state, prevents the harboring of vectors, prevents fire and CT Page 6387 explosion and minimizes the emission of objectionable odors, dust or other air pollutants so that the health, safety, and welfare of the people of the state shall be safeguarded and enhanced and the natural resources and environment of the state may be conserved, improved and protected. The commissioner shall order the alteration, extension, limitation, closure or replacement of such facilities whenever necessary to ensure against pollution of the waters of the state, prevent the harboring of vectors, prevent fire and explosion hazards and minimize the creation of objectionable odors, dust or other air pollutants so that the health, safety and welfare of the people of the state shall be safeguarded and enhanced and the natural resources and environment of the state may be conserved, improved and protected provided, before ordering the closure of any solid waste facility, said commissioner shall determine that reasonable alternative facilities for the users of such facility exist. In any such order, the commissioner may require the submission of and compliance with a plan for the design, construction, operation, monitoring, closure and postclosure maintenance of such facility in accordance with the provisions of this chapter." C.G.S. § 22a-208.
Plaintiffs' trash-to-energy plant is a "solid waste facility," a "volume reduction plant," and a "resources recovery facility." C.G.S. § 22a-207(3), (5), and (9).
Construction, operation and alteration of a facility like plaintiffs' is subject to the authority of the commissioner of environmental protection.
 "Permit for construction, alteration or operation of solid waste facility. (a) The commissioner of environmental protection may issue, deny, modify, renew, suspend, revoke or transfer a permit, under such conditions as he may prescribe — and upon submission of such information as he may require, for the construction, alteration and operation of solid waste facilities, in accordance with the provisions of this chapter and regulations adopted pursuant to this chapter." C.G.S. § 22a-208a(a).
With respect to land usage for a solid waste disposal CT Page 6388 facility, the commissioner's authority may be somewhat restricted by local or municipal law.
 "No solid waste facility shall be built or established and no solid waste facility without a permit to construct shall be altered after July 1, 1971, until the plan, design and method of operation of such facility have been filed with the department and approved by the commissioner by the issuance of a permit to construct, provided, nothing in this chapter or chapter 46e shall be construed to limit the right of any local governing body to regulate, through zoning, land usage for solid waste disposal. The commissioner shall send a written notification of any application for a permit to construct to the chief elected official of each municipality in which the proposed facility is to be located, within five business days of the date on which any such application is filed." [Italics added.] C.G.S. § 22a-208a(b).
A municipality may regulate by zoning land usage for a "solid waste disposal area."[13] The very existence of the "solid waste disposal area" exception to the commissioner's authority makes it clear that absent an express statutory exception, there is no municipal authority to impinge on the commissioner's domain. The court recognizes there are provisions of the Solid Waste Management Act whereby the Commissioner may be given input by municipalities on permits to be issued by the Commissioner for solid waste facility. But these provisions do not grant any municipality the power to lessen the commissioner's authority. Certainly such provisions do not authorize Bristol to prevent the Commissioner's permitting an expansion of the plaintiff's plant as the initiative purports to do.
The legislature has demonstrated an intent to occupy the entire field of regulation on the matters of air pollution control and solid waste management.
In Dwyer v. Farrel, 193 Conn. 7 (1984), the Supreme Court was faced with a preemption issue analogous to the case here. It involved another "hot topic," handgun control. By state law, pistols and revolvers could be sold by persons issued a state-authorized permit. A New Haven handgun ordinance required that a seller hold a federal firearms dealer license, prohibited sales from a private dwelling, and required that sale premises be located in business zone. The statutes regulating the sale of CT Page 6389 handguns contained no such restrictions.[14]
The Supreme Court held that the New Haven ordinance was preempted by the state statute. In doing so, it wrote extensively on the principles for statutory preemption of municipal ordinances.
 "There is attached to every ordinance, charter or resolution adopted by or affecting a municipality the implied condition that these must yield to the predominant power of the state when that power has been exercised. See 6 McQuillin [Municipal Corporations (3d Ed. Rev.)] 21.32. This is in keeping with our law that a municipality, as a creature of the state can exercise only such powers as are expressly granted it or such powers as are necessary to enable it to discharge the duties and carry into effect the objects and purposes of its creation. New Haven Water Co. v. New Haven, 152 Conn. 563, 566, 210 A.2d 449 (1965); see Baker v. Norwalk, 152 Conn. 312, 314, 206 A.2d 428 (1965); Bredice v. Norwalk, 152 Conn. 287, 292, 206 A.2d 433
(1964); Ingham v. Brooks, 95 Conn. 317, 328-29, 111 A. 209 (1920). Bencivenga v. Milford, 183 Conn. 168, 173, 438 A.2d 1174 (1981).
 "Where the state legislature has delegated to local government the right to deal with a particular field of regulation, the fact that a statute also regulates the same subject in less than full fashion does not, ipso facto, deprive the local government of the power to act in a more comprehensive, but not inconsistent, manner." Aaron v. Conservation Commission, 183 Conn. 532, 543, 441 A.2d 30 (1981); see also P. X. Restaurant, Inc. v. Windsor, 189 Conn. 153, 160-61, 454 A.2d 1258 (1983); Connecticut Theatrical Corporation v. New Britain, 147 Conn. 546, 552-53, 163 A.2d 548 (1960); State v. Gordon, 143 Conn. 698, 706, 125 A.2d 477 (1956). Whether an ordinance conflicts with a statute or statutes can only be determined by reviewing the policy and purposes behind the statute and measuring the degree to which the ordinance frustrates the achievement of the state's objectives. See Aaron v. Conservation Commission,
supra, 542-44; Connecticut Theatrical Corporation v. New Britain, supra; see generally 6 McQuillin, Municipal Corporations (3d Ed. Rev.) 21.35. CT Page 6390
 "General Statutes 29-28 through 29-38 clearly indicate a legislative intent to protect the safety of the general public from individuals whose conduct has shown them to be lacking the essential character or temperament necessary to be entrusted with a weapon. Rabbitt, v. Leonard, 36 Conn. Sup. 108, 115-16, 413 A.2d 489
(1979). This legislative concern extends also to those who sell or deliver handguns. A person cannot advertise for sale or sell at retail a pistol or revolver without first obtaining a permit, issued only after the applicant has furnished information pertaining to his character and identity as prescribed by the commissioner of public safety. General Statutes 29-28 and 29-28a. The handgun can be sold only in the `room, store or place described in the permit' and only to a purchaser personally known to the vendor or to a purchaser who provides evidence of his identity. General Statutes 29-31. Furthermore, the vendor must record detailed information concerning the transaction, including the name of the purchaser, as well as the make, model, caliber and manufacturer' s number of the pistol or revolver. Id. Failure to abide by these requirements subjects the transgressor to a monetary penalty and loss of liberty. General Statutes 29-37; see State v. Tirella, 22 Conn. Sup. 25, 158 A.2d 602 (1959).
 "Although the statutory pattern evinces a legislative intent to regulate the flow of handgun sales and restrict the right to sell to those establishing the requisite qualifications, it is also clear that the General Assembly anticipated that persons meeting those qualifications, including those living in residential neighborhoods and nondealers, would be permitted to sell at retail a pistol or revolver. The legislature has struck the balance between totally unregulated sales and a complete ban on sales of handguns at retail.
 "In passing this handgun ordinance, the city has placed two important and substantial restrictions on the sale at retail of handguns which most residents of the city can never overcome: (1) that the seller be a dealer, and (2) that the sale occur on premises located in an area zoned as a business district. By placing these restrictions on the sale of handguns, the ordinance CT Page 6391 effectively prohibits what the state statutes clearly permit. Nor do the defendants suggest any practical means available to either plaintiff of conforming to the ordinance.
 "A local ordinance is preempted by a state statute whenever the legislature has demonstrated an intent to occupy the entire field of regulation on the matter; East Haven v. New Haven, 159 Conn. 453, 469, 271 A.2d 110 (1970); or, as here, whenever the local ordinance irreconcilably conflicts with the statute. Shelton v. City of Shelton, 111 Conn. 433, 447, 150 A. 811 (1930). Accord, Times Mirror Co. v. Division of Public Utility Control, 192 Conn. 506, 511, 473 A.2d 768 (1984). The fact that a local ordinance does not expressly conflict with a statute enacted by the General Assembly will not save it when the legislative purpose in enacting the statute is frustrated by the ordinance. Here the New Haven ordinance removes an entire class of persons as potential sellers of handguns at retail. The state permit is rendered an illusory right because a casual seller residing in a nonbusiness zone can have no real hope of ever conforming to the local ordinance. In this respect the local ordinance conflicts with the legislative intent as expressed in the applicable statutes. The city has removed a right that the state permit bestows and thus has exceeded its powers." [Internal quotation marks omitted.] Dwyer v. Farrel, 193 Conn. 7, 10-14 (1986).
Like New Haven could not restrict the sale of handguns by a person licensed by the state, Bristol cannot restrict the proposed expansion of plaintiffs' trash-to-energy plant if the Commissioner of Environmental Protection, acting within his authority under the Air Pollution Control Act and the Solid Waste Management Act, permits the plant expansion. The initiative directly conflict with these Acts. The statutory scheme found in these Acts shows the legislature intended that the regulation of air pollution and solid waste is to be dealt with on a statewide basis. Allowing an individual municipality to legislate like the initiative proposal purports to do conflicts with the Air Pollution Control Act and the Solid Waste Management Act. Allowing municipal legislation like the initiative would frustrate the purpose of the Acts; it would undermine the whole statewide regulatory scheme. CT Page 6392
The Commissioner of Environmental Protection states that his authority does not preempt Bristol from exercising its right to exercise the Host Community Veto given it by the Inter-Community Agreement. Again, that claim is not raised by the plaintiffs. In fact, plaintiffs apparently want Bristol to state whether Bristol claims the initiative vote constitutes an exercise of the Host Community Veto. Bristol won't commit on that point. The statement, "This case does not involve a local ordinance enacted under the police power arguably occupying the same field as a state statute," is remarkable. In the Fifth Count, plaintiffs clearly claim that the Bristol initiative vote is in a field which state statutes occupy to the exclusion of municipal power. The Commissioner's insights on the Host Community Veto, a non-issue in this case, does not aid the court in determining the preemption issue raised by the Fifth Count. The Commissioner's absence of comment on the real preemption issue is telling; it suggests his agreement with plaintiffs' position.
The plaintiffs have stated a viable cause of action in their Fifth Count.
 VI.
The issue raised in the Sixth Count is quite narrow. Plaintiffs have labeled the Sixth Count, "Violation of Home Rule Act."
The Inter-Community Agreement grants Bristol, as host community, the power to thwart any expansion of plaintiff's trash-to-energy plant. According to the Inter-Community Agreement, the "Host Community Veto" must be exercised by a vote of Bristol's legislative body. Plaintiffs anticipate Bristol may claim the initiative vote was an exercise of the Host Community Veto. The Home Rule Act requires each Home Rule Charter to designate the municipality's legislature body. The Act also prescribes the bodies which the Charter may designate as the municipality's legislature. The electorate is not one of those designated. Plaintiffs claim that if Bristol were to claim the Home Rule Veto has already been exercised by the initiative vote, Bristol thereby breached the Inter-Community Agreement because only the council was empowered to exercise the veto. In short, plaintiffs' claim that only the Charter designated legislative body the city council, may exercise the veto. CT Page 6393
The key allegations of the Sixth Count are:
 "76. The Bristol City Charter was adopted under the provisions of the Connecticut Home Rule Act. Conn. Gen. Stat. § 7-187, et seq. (The "Home Rule Act").
 "77. The Home Rule Act, Conn. Gen. Stat. § 7-193
specifies the manner in which municipalities may exercise legislative authority under municipal charters adopted or amended under the provisions of the Home Rule Act.
 "78. Conn. Gen. Stat. § 7-193 provides that in any municipal charter adopted or amended under the Home Rule Act, the legislative body of a municipality shall be (A) a town meeting, (B) a representative town meeting or (C) a board of selectmen, council, board of directors or a board of burgesses or a combination of a town meeting or representative town meeting and one of the groups listed in subparagraph § 7-193(a)(1)(C).
 "79. The electors of the City of Bristol are not a legislative body which is authorized by the Home Rule Act.
 "80. The initiative procedure under Section 50 of the Bristol City Charter operates as a municipal legislative body in that it provides a means for the adoption of municipal legislation.
 "81. The initiative Proposal adopted pursuant to Section 50 of the Bristol City Charter is invalid and of no force and effect in that the initiative provisions of Section 50 are not an unauthorized forum for the exercise of legislative power under the Connecticut Home Rule Act."
Revised Complaint, ¶¶ 76-81, pp. 22-24. [109]
Bristol has challenged the Sixth Count:
 "6. The sixth count fails to state of claim upon which relief can be granted in that an initiative is by law a valid exercise of legislative power consistent with the Home Rule Act. Motion To Strike, ¶ 6. [113] CT Page 6394
Bristol apparently concedes the initiative is an exercise of legislative power. Bristol states: "Contrary to the Plaintiffs' claims in Paragraph 80, an initiative is recognized as an exercise of the legislative power by the electorate." Memorandum of Law In Support of Defendant's Motion To Strike, p. 19. [113.25] That sidesteps the real issue: Is the electorate voting pursuant to Section 50 of the Charter Bristol's legislative body under the Home Rule Act and the Inter-Community Agreement?
The Home Rule Act provides:
 "Sec. 7-193. Required provisions. Organization of government. (a) Any charter adopted or amended under the provisions of this chapter shall conform to the following requirements:
 "(1) The municipality shall have a legislative body, which may be: (A) A town meeting; (B) a representative town meeting; (C) a board of selectmen, council, board of directors, board of aldermen or board of burgesses; or (D) a combination of a town meeting or representative town meeting and one of the bodies listed in subparagraph (C). In any combination, the body having the greater number of members shall have the power to adopt the annual budget and shall have such other powers as the charter prescribes, and the body having the lesser number of members shall have the power to adopt, amend and repeal ordinances, subject to any limitations imposed by the general statutes or by the charter. The number of members in any elective legislative body, the terms of office of such members and the method by which they are elected shall be prescribed by the charter." C.G.S. § 7-193(a).
The statutory language, "the municipality shall have a legislative body," must be interpreted literally; it means a municipality shall have only one legislative body.[15] The statute, C.G.S. § 7-193(a), prescribes what that one body may be. The electorate is not among the choices.
Regarding the exercise of legislative power, the Bristol Charter provides:
 "Sec. 21. City council; powers and duties.
(a) The legislative power of the city shall be vested CT Page 6395 exclusively in the city council except as otherwise provided in this charter or by the general statutes. In addition to such powers and duties of the council as are provided by the general statutes or by other provisions of this charter, as amended from time to time, the city council shall have the power subject to the provisions of the initiative and referendum herein, to enact, amend or repeal ordinances not conflicting with the statutes of this state or this charter on any subject or matter concerning the City of Bristol for the efficient and proper carrying out of the city's affairs and maintaining law and order therein by any official, commission, board, agent, employee or by any other group or person duly authorized or for any other proper cause; which ordinances shall have the force of law within said city or within any part or parts, or at such time and places to which their terms are applicable but no such ordinance shall take effect before fourteen days from the date of its publication in a newspaper of general circulation in said city, except that an ordinance of [for] the immediate preservation of the public peace, health or safety, which contains a statement of its urgency may be made to take effect upon its passage or before the expiration of said fourteen days. Any ordinance within the above exception shall be so published within three days after its passage." Charter, City of Bristol, § 21.
It is clear from the Charter that the council is Bristol's legislative body. The court concludes that the initiative vote would not be effective as an exercise of the Host Community Veto.
Although plaintiffs have not directly questioned the very validity of the Bristol Charter's Section 50, the initiative provision, the court nevertheless has determined it should do so. This is due in part to the provision of section 21 of the charter which states:
 "The legislative power of the city shall be vested exclusively in the city council except as otherwise provided in this charter or by the general statutes.
[Italics added.]
The court has examined the Home Rule Act. No part of it purports to enable a municipality adopting a home rule charter to CT Page 6396 have an initiative procedure such as that in section 50 of the Bristol Charter.
Simons v. Canty, 195 Conn. 524 (1985), involved a recall provision in a Watertown's home rule charter. "The dispositive issue [on that appeal was] whether the Home Rule Act empowers municipalities to provide for the recall of their elected officials." Id, 525.
 "The sources of municipal authority are well defined. Municipalities, because they are creations of the state, have no inherent legislative authority. See New Haven Commission on Equal Opportunities v. Yale University, 183 Conn. 495, 499, 439 A.2d 404 (1981); Connelly v. Bridgeport, 104 Conn. 238, 252, 132 A. 690
(1926); State ex rel. Bulkeley v. Williams, 68 Conn. 131, 149, 35 A. 24 (1896), aff'd sub nom. Williams v. Eggleston, 170 U.S. 304, 18 S.Ct. 617, 42 L.Ed. 1047
(1898); Webster v. Harwinton, 32 Conn. 131, 138-39
(1864); Littlefield, "Municipal Home Rule — Connecticut's Mature Approach," 37 Conn. B.J. 390, 404-405 (1963) 2 McQuillin, Municipal Corporations (3d Ed. Rev. 1979) 10.11. They can wield only those powers expressly granted to them by the legislature; City Council v. Hall, 180 Conn. 243, 248, 429 A.2d 481 (1980); Pepin v. Danbury, 171 Conn. 74, 83, 368 A.2d 88 (1976); or necessary to the exercise of an expressly delegated power. Perretta v. New Britain, 185 Conn. 88, 102, 440 A.2d 823 (1981); New Haven Water Co. v. New Haven, 152 Conn. 563, 566, 210 A.2d 449 (1965). The constitutional provision cited by the plaintiffs merely restates the basic rule: "The general assembly shall by general law delegate such legislative authority as from time to time it deems appropriate to towns, cities and boroughs relative to the powers, organization, and form of government of such political subdivisions." Conn. Const., art. X 1. In sum, the sole font of municipal authority is legislative delegation in the form of a general statute or a special act adopted prior to the effective date of article tenth.
 "The rules that determine whether a power has been delegated to a municipality are also well established. "The legislature has been very specific in enumerating CT Page 6397 those powers it grants to municipalities. See General Statutes Title 7." Buonocore v. Branford, 192 Conn. 399, 403, 471 A.2d 961 (1984). "An enumeration of powers in a statute is uniformly held to forbid the things not enumerated." State ex rel. Barlow v. Kaminsky, 144 Conn. 612, 620, 136 A.2d 792 (1957); State ex rel. Barnard v. Ambrogio, 162 Conn. 491, 498, 294 A.2d 529 (1972). Delegation of authority to municipalities is therefore narrowly construed. See Gregory v. Bridgeport, 41 Conn. 76, 86 (1874). In determining whether a municipality has the authority to adopt a challenged charter provision, "we do not search for a statutory prohibition against such an enactment; rather, we must search for statutory authority for the enactment." Avonside, Inc. v. Zoning Planning Commission, 153 Conn. 232, 236, 215 A.2d 409 (1965)." Simons v. Canty, 195 Conn. 524, 529-531 (1985).
The Supreme Court stated that "if the legislature had intended to confer the recall power on municipalities, it would have done so explicitly." 195 Conn. @ 532. There was nothing in, the Home Rule Act conferring a recall power on municipalities. The Supreme Court held the recall provision of the Home Rule Charter invalid.
The instruction of the Supreme Court bears repeating here:
 "In determining whether a municipality has the authority to adopt a challenged charter provision, `we do not search for a statutory prohibition against such an enactment; rather, we must search for statutory authority for the enactment.' Avonside, Inc. v. Zoning Planning Commission, 153 Conn. 232, 236, 215 A.2d 409
(1965)." Simons v. Canty, 195 Conn. 524, 529-531
(1985).
A search of the Home Rule Act does not reveal any "statutory authority" for an initiative such as section 50 of the Bristol Charter. "If the legislature had intended to confer the [initiative] power on municipalities, it would have done so explicitly." It did not. Bristol has not claimed any basis for section 50 in the Home Rule Act.
The initiative provision in section 50 is not authorized by the Home Rule Act. CT Page 6398
The Bristol Charter was adopted in 1969 under the provisions of the Home Rule Act. What then is the source authority for the initiative in section 50 of the Charter?
Bristol has made several statements regarding the source authority for the section 50 initiative provision.
 "The current language of Section 50, which was adopted by the City of Bristol effective January 1, 1969, is derived from these Special Acts. By virtue of Section 60 of the Charter, the City retained the initiative rights granted pursuant to these Special Acts. Section 60 provides as follows: "All special acts or parts of special acts relating to the town and city of Bristol, except those expressly retained by the provisions of this charter are repealed." The retention of the initiative provisions of Section 50 is in conformance with the Home Rule Act, Connecticut General Statutes, Section 7-188(a)." Memorandum of Law In Support of Defendant's Motion To Strike, p. 6. [113.25]
 "In the Home Rule Act the legislature intended to give "home rule towns" the freedom to retain aspects of special acts and charters suited to particular local needs and practices. Caulfied v. Noble, supra, p. 90. The initiative provisions of Section 50 of the Bristol City Charter are derived from Special Acts of the Legislature as follows: Special Act No. 352, Section 66, 1911; Special Act No. 434, Section 138, 1931; Special Act No. 489, Section 52, 1939; and Special Act No. 188, 1955. In all that the results of the resolution voted upon and adopted shall be valid and not be repealed or amended except by vote of the people. All these Special Acts provided similarly; the final 1955 Special Act provided:
 "Special meetings of the electors for the purpose of voting on any proper question, including the removal from office of any appointee of the city council, may be called at any time by the mayor or by the city council, and shall be called whenever electors who were entitled to vote at the last general city election shall petition that such meeting be called. . . . If a majority of the qualified electors voting upon any CT Page 6399 proposed resolution shall vote in favor thereof, such resolution shall thereupon become a valid resolution of the city, and any resolution proposed by petition, or which shall be adopted by vote of the people, shall not be repealed or amended except by vote of the people.
 "The current language of Section 50, which was adopted by the City of Bristol effective January 1, 1969, is derived from these Special Acts. By virtue of Section 60 of the Charter, the City retained the initiative rights granted pursuant to these Special Acts. Section 60 provides as follows: "All special acts or parts of special acts relating to the town and city of Bristol, except those expressly retained by the provisions of this charter are repealed." The retention of the initiative provisions of Section 50 is in conformance with Connecticut General Statutes Section 7-188(a) of the Home Rule Act." Memorandum of Law In Support of Defendant's Motion To Strike, p. 17-18. [113.25]
These statements or claims that section 50 was "derived"
from special acts just do not stand analysis. Although neither party furnished the court with a copy of the Charter, the court obtained a copy from the State Library.[16] The Charter provides:
 "All special acts or parts of special acts relating to the town and city of Bristol, except those expressly retained herein by the provisions of this charter are repealed." Charter, City of Bristol, § 60.
What does the phrase, "except those expressly retained herein by the provisions of this charter," mean? It probably means that the charter must cite a special act by "chapter and verse" in order for the provisions of the special act to be retained and not repealed. For example, language such as this would suffice: The provisions of Special Act Number 188 of 1955 entitled "AN ACT CONCERNING INITIATIVE IN THE CITY OF BRISTOL" are expressly retained in this Charter as if fully set forth herein. Nowhere in the Charter does it state that Special Act No. 188 of 1955 is expressly retained herein. Nor are there words of like effect.[17]
The phrase, "except those expressly retained herein by the provisions of this charter," might also mean that the provisions CT Page 6400 of the special act to be retained would be repeated and set forth verbatim in the Charter. Section 50 is quoted in full at pages 3 and 4 above. Special Act No. 188 of 1955, "AN ACT CONCERNING INITIATIVE IN THE CITY OF BRISTOL," is set forth in full in the footnote.[18]
A comparison of section 50 and Special Act 188 of 1955 quickly reveals that section 50 is not a verbatim recitation of the 1955 special act. There are substantial differences. The differences are not mere matters of form. For example, section 50 requires the signatures "of 15 per cent of the electors who were entitled to vote at the last general city election." Special Act No. 188 required only 10 per cent. For approval of a matter, section 50 has a minimum vote requirement, i.e. "at least 20 per cent of the electors entitled to vote on the matter."[19]
Special Act No. 188 had no minimum vote requirement. There are other substantial differences. Suffice it to say, Special Act 188 of 1955 was not "expressly retained" in section 50 of the Bristol Charter.[20]
It follows that Special Act No. 188 of 1955, AN ACT CONCERNING INITIATIVE IN THE CITY OF BRISTOL, was repealed when Bristol adopted its Home Rule Charter in 1969. Charter, City of Bristol, § 60.
Section 50's initiative procedure is not authorized by the Home Rule Act. Special Act No. 188 of 1955 from which section 50 "was derived" was repealed when the Charter was adopted. The "search for statutory authority for the enactment [section 50]" has been in vain.
The court concludes that section 50's initiative procedure is null and void. It follows that exercise of the Host Community Veto by the initiative vote exceeds the authority of and is contrary to the Home Rule Act, the Bristol Charter, and the Inter-Community Agreement.
The Sixth Count states a viable cause of action.
 VII
The allegations specific to the Seventh Count are:
 "82. Sections 4.02 and 4.03 of the Inter-Community Agreement, to which the City of Bristol is a party, CT Page 6401 provides that a position taken by a Contracting Community shall be determined "by the legislative body of each Contracting Community or, to the extent permitted by the law of the State of Connecticut, by a duly authorized agent of each Contracting Community, including if appropriate, the [BRRFOC]."
 "83. The legislative body in Bristol is the City Council, pursuant to Charter Section 21(a).
 "84. The initiative procedure under Section 50 of the Bristol City Charter operates in lieu of a determination by the legislative body of the City of Bristol in that it provides for an alternative means for the adoption of a municipal position.
 "85. The Initiative Proposal adopted pursuant to Section 50 of the Bristol City Charter is a position on a matter affecting the Bristol Resource Recovery Project and the BRRFOC and is a breach of the Inter-Community Agreement in that it is a position not determined by the legislative body of the City of Bristol." Revised Complaint, ¶¶ 82-85, pp. 24-25. [109]
Bristol challenges the Seventh Count as follows:
 "7. The seventh count fails to state a claim upon which relief can be granted in that the allegations do not state a good cause of action in contract, there is no duty alleged, there is an available alternative means of redress and the plaintiff Ogden Martin Systems of Bristol, Inc. is not alleged to be a party to the Inter-Community Agreement." Motion To Strike, ¶ 7. [109]
Plaintiffs allege: "The Initiative Proposal . . . is a breach of the Inter-Community Agreement in that it is a position not determined by the legislative body of the City of Bristol." ¶ 85.
The Inter-Community Agreement names Bristol as "Host Community. ¶ 39. The Inter-Community Agreement grants Bristol, as Host Community, authority "to exercise a Host Community Veto to prevent the proposed expansion." ¶ 40. The Inter-Community Agreement also provides that any Contracting Community's "position" CT Page 6402 on an Inter-Community Agreement matter must be determined by its legislative body. ¶ 82. The Host Community Veto is a position on an Inter-Community Agreement matter. Bristol's legislative body is its City Council.
Plaintiffs allege the Initiative provides an alternative to a determination by the City Council to exercise the Host Community Veto ¶ 84. According to plaintiffs, exercise of the Host Community Veto by the Initiative rather than by City Council action is a breach of the Inter-Community Agreement. ¶ 85.
The question is whether the Inter-Community Agreement permits exercise of the Host Community Veto by means of the Initiative rather than by City Council action. The court's believes the Initiative is not a permitted way to exercise the Host Community Veto under the Inter-Community Agreement.[21] If that is so, plaintiffs have stated a viable cause of action in the Seventh Count.
But, there is an alternative way to determine the issues with regard to the Seventh Count. This is a matter of contract interpretation. Contract interpretation generally presents a question of fact. Levine v. Massey, 232 Conn. 272 (February 21, 1995); Barnett v. Board of Education, 232 Conn. 198, 207
(February 14, 1995); Finlay v. Aetna Life Casualty Co.,202 Conn. 190, 199 (1987). At trial, plaintiffs should have the opportunity to present evidence to establish the fact that the parties to the Inter-Community Agreement (Contracting Communities) intended that Bristol could exercise the Host Community Veto only by action of the City Council and not by the Initiative procedure. There being a question of fact, the meaning of the contract provision, the Seventh Count adequately states a breach of contract action which survives a motion to strike.
Bristol points out there is no allegation of an actual breach. Connecticut law recognizes an action for anticipatory breach of contract. Pullman, Comley, Bradley Reeves v. Tuck-it-away,Bridgeport, Inc., 28 Conn. App. 460, 465, cert. denied,223 Conn. 926 (1992); Martin v. Kavanesky, 157 Conn. 514. 518-19 (1969). The language of the Seventh Count is broad enough to permit proof of such a cause of action.
The Seventh Count states a viable cause of action.
VIII
CT Page 6403
This is also an action for a declaratory judgment. Bristol states: "The court must inquire into the source of the underlying right or claim on which the plaintiffs' declaratory judgment action is predicated." Memorandum In Support of Defendant's Motion To Dismiss, p. 2. [113.25] Bristol also addresses the propriety of the declaratory judgment action later in its memorandum; there Bristol suggests that a breach of contract action would provide "an available alternative means of redress." Id, 20.
There is recent Supreme Court authority which sums up the purpose of an action for a declaratory judgment.
 "The purpose of a declaratory judgment action, as authorized by General Statutes 52-29[5] and Practice Book 390,[6] is to "secure an adjudication of rights where there is a substantial question in dispute or a substantial uncertainty of legal relations between the parties." (Emphasis added.) Connecticut Assn. of Health Care Facilities, Inc. v. Worrell, 199 Conn. 609, 613, 508 A.2d 743 (1986). General Statutes 52-29(a) requires that a declaratory judgment "declare rights and other legal relations." (Emphasis added.) Similarly, Practice Book 390 requires that the plaintiff be in danger of a loss or uncertainty "as to his rights or other jural relations." and that there be a bona fide "issue in dispute or substantial uncertainty of legal relations." (Emphasis added.) Thus, "[d]eclaratory relief is a mere procedural device by which various types of substantive claims may be vindicated." Luckenbach Steamship Co. v. United States, 312 F.2d 545, 548 (2d Cir. 1963).
 "Implicit in these principles is the notion that a declaratory judgment action must rest on some cause of action that would be cognizable in a nondeclaratory suit. See Hodgdon v. Campbell, 411 A.2d 667, 669 (Me. 1980) (declaratory judgment statutes do "not create a new cause of action; [their] purpose is `to provide a more adequate and flexible remedy in cases where jurisdiction already exists'"). To hold otherwise would convert our declaratory judgment statute and rules into a convenient route for procuring an advisory opinion on moot or abstract questions; see Anderson v. Southwest Savings Loan Assn., 117 Ariz. 246, 571 P.2d 1042
CT Page 6404 (1977); and would mean that the declaratory judgment statute and rules created substantive rights that did not otherwise exist. We decline so to hold.
 "Consequently, in analyzing whether a declaratory judgment action is barred by a particular statutory period of limitations, a court must examine the underlying claim or right on which the declaratory action is based. Romer v. Leary, 425 F.2d 186, 188 (2d Cir. 1970); Swan v. Board of Higher Education, 319 F.2d 56, 59 (2d Cir. 1963); Luckenbach Steamship Co. v. United States, supra, 548-59; cf. Gannon v. Sanders, 157 Conn. 1, 7, 244 A.2d 397 (1968) (in determining whether plaintiff has standing in a declaratory judgment action, court must look at underlying claim on which action is based). It necessarily follows that if a statute of limitations would have barred a claim asserted in an action for relief other than a declaratory judgment, then the same limitation period will bar the same claim asserted in a declaratory judgment action.
 "We must, therefore, inquire into the source of the underlying right or claim on which the plaintiffs' declaratory judgment action is predicated." [Footnotes omitted.] Wilson v. Kelley, 224 Conn. 110, 115-117
(1992).
The Revised Complaint amply demonstrates "there [are] a [number of] substantial question[s] in dispute [and] a substantial uncertainty of legal relations between the parties." The Revised Complaint shows "plaintiff[s] [are] in danger of a loss [and there is] uncertainty as to their rights or other jural relations." Certainly, there are bona fide issues in dispute and substantial uncertainty of legal relations.
The court has made an in depth review of the claims Bristol has made regarding all seven counts of the Revised Complaint. The court has determined that each of the seven counts should survive Bristol attacks. The court has made due "inquir[y] into the source of the underlying right or claim on which plaintiff[s]' declaratory judgment action is predicated." The underlying claims are more than sufficient to support an action for a declaratory judgment.
Bristol maintains that plaintiffs' simple breach of contract CT Page 6405 action should not be determined in an action for a declaratory judgment. But that is not our law. The Supreme Court has oft said that a simple breach of contract claim may be determined in either a breach of contract action or an action for a declaratory judgment. Petrovich v. Board of Education, 189 Conn. 585, 589
(1983); Light v. Board of Education, 170 Conn. 35, 41 (1975);Milford Education Association v. Board of Education, 167 Conn. 513,520 (1975); New Haven Water Co. v. New Haven, 131 Conn. 456,464 (1944).
Plaintiffs claim Bristol has breached, or will breach, the Inter-Community Agreement:
 "42. There is uncertainty as to whether the Initiative Proposal constitutes an exercise of the Host Community Veto or will cause Bristol to exercise the Host Community Veto.
 "43. Despite the uncertainty in this area and in light of the fact that the Initiative Proposal has been addressed in numerous regular sessions and executive sessions of the BRRFOC as well as in Bristol Press and Hartford Courant newspaper articles, since November, 1991, and continuing to the present time, Bristol has neither confirmed nor denied to the BRRFOC or to Ogden Martin that the vote on the Initiative Proposal does not constitute an exercise of Bristol's Host Community Veto of the proposed expansion.
 "44. Bristol has refused to confirm to the BRRFOC or to Ogden Martin that, despite the vote on the Initiative Proposal, Bristol will not exercise the Host Community Veto.
 "45. The existing uncertainty has made it impossible for the BRRFOC and Ogden Martin to take the steps necessary to obtain approval for, and to build, the expansion unit." Revised Complaint, ¶¶ 42-45.
The Initiative Proposal came about due to an "anticipation of the potential expansion" of plaintiffs' plant. Revised Complaint, ¶ 31. It clearly was an attempt by various Bristol citizens to thwart expansion. Bristol with its Host Community Veto can legitimately prevent that expansion. One question posed by the Seventh Count is whether the Host Community Veto already CT Page 6406 has been exercised by the Initiative. Apparently Bristol won't disclose its stance on that question. A second question is whether the Initiative is a valid way under the Inter-Community Agreement to exercise the Host Community Veto. A third, but intertwined question is whether the parties to the Inter-Community Agreement intended that Bristol could exercise the Host Community Veto by the Charter's Section 50 initiative procedure even though the Charter designates the council as its legislative body. The powers-that-be in Bristol, presumably the council, have chosen not to tell the plaintiffs their stance on these questions. Perhaps they are not obligated to. There is some suggestion in the record that the Host Community Veto can be exercised only when a formal expansion proposal is presented to Bristol, as Host Community. The record suggests the plaintiffs have not presented Bristol with a formal proposal for plant expansion.[22]
There is uncertainty on several levels here. Plaintiffs have a right to know the answers to these and other questions.[23]
Bristol has chosen to play it close to the vest leaving the plaintiffs in a quandary. It seems to the court that the declaratory judgment procedure is meant for the situation presented here.
If the initiative is not an ordinance, but only an expression of the electorate's views on plant expansion, the council may well take the initiative vote as a direction by the electors to scuttle plant expansion. If this be true, the die is cast and all that awaits is the council's formalizing the veto action when and if plaintiffs present their proposal for expansion to Bristol. But, plaintiffs are entitled to some guidance. Presumably, preparation of a formal expansion plan will be costly. If Bristol demands such a formal presentation before it will disclose its position on the Host Community Veto, especially if it is certain it intends to veto same, Bristol may be inviting pure economic waste which does not advantage anyone, even Bristol.
Plaintiffs also seek injunctive relief. Revised Complaint, p. 27. [109] Bristol challenges this type of relief; the Revised Complaint does not have allegations of either irreparable harm or lack of an adequate remedy at law. Memorandum of Law In Support of Defendant's Motion To Strike, p. 20-21. [113.25] Bristol is correct.
 "A party seeking injunctive relief has the burden of alleging and proving irreparable' harm and lack of an CT Page 6407 adequate remedy at law. The allegations and proof are conditions precedent to the granting of an injunction. Stocker v. Waterbury, 154 Conn. 446, 449, 226 A.2d 514
(1967); Theurkauf v. Miller, 153 Conn. 159, 161, 214 A.2d 834 (1965); Stapleton v. Lombardo, 151 Conn. 414, 416, 198 A.2d 697 (1964). These elements are so crucial that a party' s failure to allege and prove them is sufficient ground for sustaining the refusal to grant an injunction, even where a court's conclusions on the merits are erroneous. Koepper v. Emanuele, 164 Conn. 175, 177, 319 A.2d 411 (1972)." City of Hartford v. American Arbitration Association, 174 Conn. 472, 476-7
(1978).
The critical allegations are missing. If plaintiffs intend to seek injunctive relief, the complaint should be amended to include the allegations of irreparable harm and lack of an adequate remedy at law.[24]
The Motion To Strike [113] is denied with respect to each of the seven counts of the Revised Complaint.
* * * * *
This action has been much delayed; mainly by the court. There are significant issues here which should be resolved expeditiously. None of the parties gains in the long run by stretching out this litigation.[25] The court believes that a conference of counsel and the court might quicken the future course of this case. After considering and digesting this memorandum, the parties should confer to determine if all parties agree that such a exploration conference should be held. If the parties agree that a conference is worth having, counsel should contact the court to arrange for same. If requested by all the parties, the court will schedule a conference forthwith.
Parker, J.
Bristol